**Charles Michael SMITH, Petitioner,**

v.

**Ernie ROE, Warden, Respondent.**

**No. CV 01–10186–RSWL.**

United States District Court,
C.D. California.

Nov. 15, 2002.

Charles Michael Smith, Susanville, CA, pro se.

Xiomara Costello, Deputy Atty. Gen., State of Cal. Dept. of Justice, Los Angeles, CA, for respondent.

**ORDER ADOPTING FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

LEW, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the entire record

in this action, as well as the Final Report and Recommendation of the United States Magistrate Judge and any objections thereto. The Court has made a *de novo* determination with respect to any portions of the Final Report and Recommendation as to which objection has been made.

**IT IS ORDERED** that: (1) the Final Report and Recommendation of the United States Magistrate Judge be adopted; and (2) judgment be entered denying the petition and dismissing this action with prejudice.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on the parties.

## FINAL REPORT AND RECOMMEN-
### DATION OF UNITED STATES
### MAGISTRATE JUDGE

HILLMAN, United States Magistrate Judge.

This Final Report and Recommendation is submitted to the Honorable Ronald S.W. Lew, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 01–13 of the United States District Court for the Central District of California. For the reasons set forth below, the petition should be denied and the action dismissed with prejudice.

### I. Background

On June 7, 2000, a jury convicted petitioner of one count of murder (Cal.Penal Code § 187(a)) in Ventura County Superior Court Case No. CR 47865, and found true that petitioner had personally used a knife, a deadly and dangerous weapon, in committing that offense (Cal.Penal Code §§ 12022(b)). [Clerk's Transcript ("CT") 128–129, 133; Reporter's Transcript on Appeal ("RT") 376–378.]

On July 5, 2000, he was sentenced to state prison for a term of 16 years to life (15–years–to–life for second-degree murder and a one-year enhancement for use of a knife). [CT 143–147; RT 391–392.]

Petitioner appealed the judgment of conviction in the California Court of Appeal, and on June 21, 2001, that court affirmed the judgment in an unpublished, reasoned opinion. [Return Exhibits ("Ret.Exs.") B, G.] On July 23, 2001, that court denied a petition for rehearing. [Ret. Exs. I, J.]

He filed in the California Supreme Court a petition for review that was denied on September 12, 2001. [Ret. Exs. K, L.]

Petitioner filed in the California Court of Appeal a petition for habeas corpus that was denied on June 21, 2000. [Ret. Exs. C, H.]

On November 27, 2001, petitioner filed the instant habeas petition ("the Petition" or "Pet.").

On March 26, 2002, respondent filed the Return ("Ret.").

On April 24, 2002, petitioner filed the Traverse ("Trav.").

### II. Factual Background

The California Court of Appeal's factual summary of the evidence at petitioner's trial is set forth in haec verba:

[Petitioner] has a long history of domestic violence. In 1981, he married Cecilia Snow. Snow testified that towards the end of their four– or five-year marriage, [petitioner] became verbally and physically abusive towards her. About once a month, [petitioner] would get angry, call her a bitch and push her up against a wall. Once, he hit her in the face. Snow testified that two days before this murder, Smith called to apologize for calling her a bitch the week before. Smith told her he was suicidal, which she said was typical of him.

In 1989, [petitioner] moved in with Connie Hansen shortly after they began dating. Hansen testified that during a

vacation, [petitioner] felt abandoned on a plane flight because Hansen changed her seat. After the flight, [petitioner] punched or kicked Hansen in the back. After that, the relationship became a "nightmare" for Hansen. [Petitioner] prevented her from answering the telephone or he listened in on her conversations. He belittled her in front of his friends, called her a bitch, and prevented her from going places. Once, [petitioner] took her car keys in an effort to prevent Hansen from visiting her son when he was in the hospital. [Petitioner] called her frequently at work or he would show up and make a scene. He accused her of having affairs without any grounds for believing this. He began sleeping with a kitchen knife by his side to protect himself from Hansen. Hansen was fearful of Smith and could not sleep because of this.

His abusiveness escalated. He threw things at her face. He threw her against the wall and then picked her up off the floor by her hair or her neck and pushed her against the wall. [Petitioner] would do similar things to her 18–year–old son. [Petitioner] followed her to work, confronted her with a knife, and accused her of leaving him for another man. She obtained a restraining order against [petitioner] which he violated 19 times. [Petitioner] testified that he committed these harassing and violent acts and had serious anger control problems.

Before killing his girlfriend, Pamela Ostrem, [petitioner] became abusive towards her. On July 6, 1999, Deputy James Desoto responded to a call concerning a domestic disturbance between [petitioner] and Ostrem. Desoto noticed that Ostrem's eyes looked red, but one looked more bloodshot than the other. Ostrem told Desoto that [petitioner] shook her, pushed her to the ground and poked her in the eye.

On July 31, 1999, due to complaints from other campers about fighting, a park ranger and a deputy sheriff spoke with Ostrem at Lake Cachuma. Both Smith and Ostrem had been drinking. The ranger and the deputy sheriff noticed that Ostrem had a bloody nose. Ostrem told them that her fiancé, [petitioner], punched her in the face.

Deputy Sheriff Theo Lankford responded about four times to calls from Ostrem regarding harassing telephone calls and domestic violence. The first time Ostrem called, she said [petitioner] battered her. When he responded to the call, Deputy Lankford noticed that she had a black or bruised eye. She said that the injury occurred when [petitioner] rolled her off the bed and she hit her eye on a table. She claimed it was an accident and that she did not need the deputy anymore.

Deputy Lankford responded to another call on September 20, 1999. Ostrem stated that [petitioner] had struck her. She said that [petitioner] bloodied her nose and slapped her arm. Lankford noticed dried blood in her nostrils.

Deputy Sheriff Shannon Collins responded to a call concerning domestic violence at 4:30 in the morning of September 30, 1999. Collins noticed a cut on Ostrem's lip. Ostrem told Collins that [petitioner] had rolled over in bed and hit her in the face. But Ostrem told Collins that it was an accident, and she called 911 because she did not know what else to do.

During the evening of December 20, 1999, [petitioner] killed Ostrem. Late that afternoon, Ostrem and Smith visited their neighbors, Lisa and Anthony Chambers. After consuming some beer, [petitioner] drank nearly a fifth of vodka that he found in the Chambers' apartment. Anthony heard [petitioner] tell

Lisa that he loved Lisa like he loved Ostrem.

[Petitioner] yanked Lisa on top of him on a couch telling her how he could make her a happy woman. She responded that she just got married and she was very happy with her husband. Lisa pushed [petitioner] away, got up, and headed for the front door. [Petitioner] grabbed her and tried to kiss her, but Lisa ducked and he kissed the front door. He called her a bitch. [Petitioner] and Ostrem left.

[Petitioner] left his sandals in the Chambers' apartment. A few minutes later, Anthony grabbed the sandals, walked over to [petitioner's] apartment and tossed them by the front door. Anthony overheard [petitioner] slam a glass sliding door and say, "You'll pay for that, bitch."

Another neighbor heard a commotion. As the neighbor was standing on his balcony, he saw a couple walking towards [petitioner's] apartment. He did not recognize them. He heard a man's voice saying, "Fuck you, Tony." He then heard the man call a female a bitch.

[Petitioner] called his daughter for a ride to the store. When she told him she could not help because she was babysitting, he said, "Thanks a lot, you fucking bitch."

A few hours later, the sheriff's department received a 911 call from [petitioner]. Deputy Sheriffs Brent Johnson and Steve Jenkinson went to [petitioner's] apartment in response to a dispatch call. Before entering the apartment, Deputy Johnson looked through the blinds of a sliding glass door. He saw [petitioner] lying on his side in a pool of blood near the front door. Deputy Johnson saw a bloody, twelve-inch, serrated knife about five or six inches away from [petitioner's] outstretched arm. The deputies entered the apartment through the unlocked front door. A cordless telephone

lay underneath [petitioner's] chin. [Petitioner] was breathing, conscious and moaning.

While Deputy Johnson got a first aid kit from his patrol car, he heard Deputy Jenkins report over the radio that there was a second body. Ostrem's cold body was lying face down in a pool of wet blood between the bathroom and the bedroom towards the back of the apartment. Ostrem had suffered lacerations and other puncture wounds, but she died from a stab wound to her chest. DNA analysis of blood found on [petitioner's] hand revealed blood from both Ostrem and [petitioner].

[Petitioner] was alert, coherent and selectively answering questions when paramedics arrived. He had suffered some abrasions and lacerations as well as a stab wound to his abdomen. He said he was going to die from pneumothorax, a lung condition caused by a puncture wound to the chest. He asked a paramedic to let him die. When asked by the ambulance attendant if it was his wife or his girlfriend that he stabbed, [petitioner] responded, "it was my girlfriend."

At one time during the investigation, [petitioner] told detectives that he did not know who committed the crime. At another time, [petitioner] told them he thought Michael Lawrence, a friend of Ostrem's, might have done it. In March 2000, however, [petitioner] admitted that he killed her.

[Petitioner] testified that he became enraged and killed Ostrem because she taunted him by saying she had sex with Lawrence. He testified that he has a real problem with his temper. [Petitioner] testified that he repeatedly called Ostrem a "fucking bitch." He admitted that he previously called Lawrence threatening to stab and kill him. [Peti-

tioner] said that he went into the kitchen, grabbed a knife, slammed the sliding glass door, and started stabbing her to death. He testified that he grabbed the knife because he wanted to kill Ostrem. He acknowledged that it is possible he slammed the sliding door so that no one would hear what he was about to do. Then, he testified, he stabbed himself.

Although [petitioner] finally admitted before trial that he killed Pamela, he pled not guilty to the murder charge. The prosecution tried the case on the theory of second degree murder. The defense asserted that [Petitioner] committed only voluntary manslaughter.

[Ret. Ex. G at 170–174.]

### III. Petitioner's Contentions [1]

The Petition alleges the following grounds for relief:

1. The trial court violated petitioner's state and federal constitutional rights to equal protection by admitting evidence of his prior acts of domestic violence under California Evidence Code § 1109. [Pet. at 6; Ground 1.]

2. The trial court violated petitioner's state and federal (Fifth and Fourteenth Amendment) constitutional rights to due process by admitting evidence of his prior acts of domestic violence under California Evidence Code § 1109. [Pet. at 6; Ground 2.]

3. The trial court violated petitioner's state and federal constitutional rights to a jury trial and due process by instructing the jury on CALJIC 2.50.02 (1999 Revision). [Pet. at 7; Grounds 3, 4.]

---

1. The claims in the Petition have been liberally construed. *Maleng v. Cook,* 490 U.S. 488, 493–494, 109 S.Ct. 1923, 1927, 104 L.Ed.2d 540 (1989) (rule of deference for construing *pro se* litigant's habeas petition); *see also*

### IV. Standard of Review

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, because it was filed after AEDPA's effective date of April 24, 1996. *See Slack v. McDaniel,* 529 U.S. 473, 480–481, 120 S.Ct. 1595, 1602, 146 L.Ed.2d 542 (2000) (citing *Lindh v. Murphy,* 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)).

Under the AEDPA, a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *see Duhaime v. Ducharme,* 200 F.3d 597, 600 (9th Cir.1999).

"Clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U.S.C. § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *Van Tran v. Lindsey,* 212 F.3d 1143, 1154 (9th Cir.2000), *cert. denied,* 531 U.S. 944, 121 S.Ct. 340, 148 L.Ed.2d 274 (2000).

· As explained by the Supreme Court, section 2254(d)(1) "places a new constraint

---

*Zichko v. Idaho,* 247 F.3d 1015, 1020 (9th Cir.2001)(liberal construction of pro se complaints and motions); *United States v. Seesing,* 234 F.3d 456, 462–463 (9th Cir.2000)(same).

on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. at 1523. The Court held:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. at 412–413, 120 S.Ct. at 1523; *accord Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001); *Anthony v. Cambra,* 236 F.3d 568, 578 (9th Cir.2000)(applying *Williams*), *cert. denied,* 533 U.S. 941, 121 S.Ct. 2576, 150 L.Ed.2d 739 (2001).

A federal habeas court making the "unreasonable application" inquiry "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor,* 529 U.S. at 409, 120 S.Ct. at 1521. "[E]ven if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." *Penry,* 121 S.Ct. at 1918 (*citing Williams v. Taylor*); *accord Delgado v. Lewis,* 223 F.3d 976, 980–981 (9th Cir.2000); *see also Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002)("We stressed in *Williams* that an unreasonable application is different from an incorrect one.").

The Ninth Circuit has determined that the "clear error" standard is the appropri-

ate doctrine for determining what constitutes an "unreasonable application" of federal law under 28 U.S.C. § 2254(d):

> [U]nder AEDPA we must reverse a state court's decision as involving an "unreasonable application" of clearly established federal law when our independent review of the legal question does not merely allow us ultimately to conclude that the petitioner has the better of two reasonable legal arguments, but rather leaves us with a "firm conviction" that one answer, the one rejected by the court, was correct and the other, the application of the federal law that the court adopted, was erroneous—in other words that clear error occurred.

*Van Tran,* 212 F.3d at 1153–1154; *accord Anthony,* 236 F.3d at 578; *Delgado,* 223 F.3d at 981 ("Absent clear error, the deference we owe state decisions dictates a denial of habeas relief, even when we conclude that a legal error has occurred.").

■ Ninth Circuit case law "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help . . . determine what law is 'clearly established.'" *Van Tran,* 212 F.3d at 1154 (quoting *Duhaime,* 200 F.3d at 600–601); *accord Bailey v. Newland,* 263 F.3d 1022, 1029–1030 (9th Cir.2001), *cert. denied,* ——— U.S. ———, 122 S.Ct. 1556, 152 L.Ed.2d 479 (2002).

Under AEDPA, state court findings of fact are presumed correct unless petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

■ When the California Supreme Court has summarily denied a claim without giving a rationale, this is considered a denial "on the merits," and is presumed to rest on grounds articulated by a lower court in its written opinion. *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Hunter v.*

*Aispuro,* 982 F.2d 344, 347–348 (9th Cir. 1992), *cert. denied,* 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993). A reviewing court may then "look through" the unexplained summary denial, and apply the deferential standard of 28 U.S.C. § 2254(d), to the lower state court's reasoned decision. However, when there is no state court decision articulating a rationale, a reviewing court "has no basis other than the record" for determining whether the state court decision merits deference under 28 U.S.C. § 2254(d)(1). *Delgado,* 223 F.3d at 981–82. In such circumstances, a reviewing court can still apply the "objectively reasonable" standard of

*Williams* to the state court decision. This does not mean *de novo* review by the federal court, but rather "an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." *Thomas v. Hubbard,* 273 F.3d 1164, 1170 (9th Cir.2001); *Bailey,* 263 F.3d at 1028; *Delgado,* 223 F.3d at 982.

## V. Discussion [2, 3]

### A. California Evidence Code § 1109

#### 1. Equal Protection Claim

 Petitioner claims that the trial court violated his state and federal consti-

---

**2.** Respondent contends that all of the Petition's claims are barred by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334. [Ret. at 10–14.] This court must first consider such contention, if it has been "properly raised by the state," before considering the claims' merits. *Horn v. Banks,* 536 U.S. 266, 122 S.Ct. 2147, 2150, 153 L.Ed.2d 301 (2002); *Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). The *Teague* rule is a "nonretroactivity principle" that "prevents a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final." *Caspari,* 510 U.S. at 389, 114 S.Ct. at 953. AEDPA requires this court to look to "clearly established Federal law"—that is, holdings of the Supreme Court. *Williams,* 529 U.S. at 412, 120 S.Ct. at 1523; *Van Tran,* 212 F.3d at 1154. Respondent fails to point to any Supreme Court holding, otherwise applicable to any claim herein, that amounts to a "new rule"—that is, a rule which "breaks new ground or imposes a new obligation on the States or the Federal Government," and in which "the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U.S. at 299, 301, 109 S.Ct. at 1069, 1070 (italics in original). In short, the *Teague* issue has not been "properly raised by the state." *See Horn,* 122 S.Ct. at 2150.

**3.** In petitioner's Objections to the Report and Recommendation, filed August 7, 2002, he sought leave to file an amended petition asserting an ineffective assistance of counsel

claim, which he alleged had been exhausted. On September 11, 2002, the court issued a Minute Order permitting petitioner to add "a federal claim of ineffective assistance of counsel which has been fairly presented to the California Supreme Court." Petitioner filed an Amended Petition on September 27, 2002, in which he asserted the claim but conceded that it had not been presented to the California Supreme Court. Regardless of petitioner's apparent failure to exhaust his state court remedies prior to amending the petition, the ineffective assistance claim is subject to dismissal because it is without merit. 28 U.S.C. § 2254(b)(2)("An application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). To establish a claim of ineffective assistance of counsel, petitioner must show *both* that counsel's representation fell below an objective standard of reasonableness, *and* that counsel's deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner appears to assert that trial counsel's performance was deficient because he failed to present evidence of petitioner's voluntary and involuntary intoxication, and his resulting unconscious state, to negate the specific intent element of second degree murder. [Am. Pet. 3–4.] Assuming, *arguendo,* that counsel's performance was deficient in this regard, petitioner cannot demonstrate a reasonable probability that, but for the error, the result of his trial would have been different. At trial, petitioner admitted:

tutional rights to equal protection by admitting evidence of his prior acts of domestic violence under California Evidence Code § 1109 [4,5] [Pet. at 6; Ground 1.]

 The Equal Protection Clause "embodies a general rule that States must

treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799, 117 S.Ct. 2293, 2297, 138 L.Ed.2d 834 (1997) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) and *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed.

that he had retrieved a knife with an eleven-inch blade from the kitchen because he wanted to kill the victim; repeatedly stabbing the victim and killing her; the probability that he slammed the sliding door immediately before stabbing the victim so that no one would hear what he was about to do; and that, as he slammed the door, he said "you'll pay for that, bitch." [RT 278–79, 285–86.] Based on the foregoing evidence of specific intent to murder, there is no reasonable probability that the result would have been different had counsel presented evidence of intoxication. Accordingly, petitioner's ineffective assistance of counsel claim should also be dismissed.

4. Cal. Evid.Code § 1109 provides in relevant part:

(a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.

\*　　\*　　\*　　\*　　\*　　\*

(c) This section shall not be construed to limit or preclude the admission or consideration of evidence under any other statute or case law.

(d) As used in this section, "domestic violence" has the meaning set forth in Section 13700 of the Penal Code. "Abuse of an elder or a dependent adult" has the meaning set forth in Section 15610.07 of the Welfare and Institutions Code.

(e) Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice....

Cal.Penal Code § 13700 provides in pertinent part:

As used in this title:

(a) "Abuse" means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.

(b) "Domestic violence" means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship. For purposes of this subdivision, "cohabitant" means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship. Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) joint use or ownership of property, (4) whether the parties hold themselves out as husband and wife, (5) the continuity of the relationship, and (6) the length of the relationship....

Cal. Evid.Code § 352, to which evidence offered under Cal. Evid.Code § 1109 is subject, provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

5. Petitioner's equal protection claim brought under the state constitution (Cal. Const., art. I, § 7) is not cognizable in a federal habeas proceeding. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Engle v. Isaac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982); 28 U.S.C. § 2254(a); *see also Bonin v. Calderon*, 77 F.3d 1155, 1161 (9th Cir.1996)(no federal habeas relief for state law error not amounting to denial of federal constitutional right), *cert. denied*, 516

1124 (1940)). The Fourteenth Amendment "guarantees equal laws, not equal results." *McQueary v. Blodgett,* 924 F.2d 829, 835 (9th Cir.1991) (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979)). "The State must govern impartially. General rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply with this principle." *McQueary,* 924 F.2d at 834 (quoting *Jones v. Helms,* 452 U.S. 412, 423, 101 S.Ct. 2434, 2442, 69 L.Ed.2d 118 (1981)). "[L]egislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.'" *Estelle v. Dorrough,* 420 U.S. 534, 539, 95 S.Ct. 1173, 1176, 43 L.Ed.2d 377 (1975).

▆▆▆ Under the "prevailing rational relationship test," a habeas petitioner has the burden of alleging facts sufficient to establish "a prima facie case of uneven application." [6] *McQueary,* 924 F.2d at 835. "[A] mere demonstration of inequality is not enough.... There must be an allegation of invidiousness or illegitimacy in the statutory scheme before a cognizable claim arises." 924 F.2d at 835.

▆▆▆ "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller,* 509 U.S. at 319, 113 S.Ct. at 2642 (citations omitted). "[A] classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" 509 U.S. at 320, 113 S.Ct. at 2642 (citations omitted). "[T]he burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it." 509 U.S. at 320, 113 S.Ct. at 2643 (citations and internal quotation marks omitted). "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even where there is an imperfect fit between means and ends." 509 U.S. at 321, 113 S.Ct. at 2643.

▆▆▆ According to petitioner, Cal. Evid. Code § 1109 "causes differential treatment" between a person charged with a violent crime in "the context of domestic abuse" and another person charged with the same crime who is not in "a domestic relationship." [Pet. at 6; Ret. Ex. K at 212.] This "differential treatment" consists of the fact that only a defendant charged with an offense involving domestic violence "face[s] having prior acts admitted to prove his propensity to commit a charged act of violence." [Ret. Ex. B at 113.] [7]

---

U.S. 1143, 116 S.Ct. 980, 133 L.Ed.2d 899 (1996).

6. Under equal protection analysis, a classification that neither involves a suspect class nor affects a fundamental right, is subject to rational-basis review, not strict scrutiny, and is accorded a strong presumption of validity. *See Heller v. Doe,* 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *accord United States v. Hancock,* 231 F.3d 557, 565 (9th Cir.2000), *cert. denied,* 532 U.S. 989, 121 S.Ct. 1641, 149 L.Ed.2d 500 (2001). Petitioner does not claim that he is a member of a suspect class, but he does contend that "the state must have a compelling interest to treat domestic violence offenders differently from

other violent offenders," because "the introduction of prior act evidence solely to show propensity lowers the prosecution's burden and violates the fundamental constitutional right to due process." [Ret. Ex. B at 113.] As discussed in section V.A.2., *infra,* this court concludes that Cal. Evid.Code § 1109 does not lower the prosecution's burden of proof as to the charged offense and therefore does not infringe petitioner's fundamental due process rights. Hence, this equal protection claim is subject to rational-basis review, not strict scrutiny.

7. Petitioner first raised this claim on direct appeal. [Ret. Ex. B at 107, 112–113.] The California Court of Appeal did not address

■ California appellate courts have articulated a rational basis for the operation of Cal. Evid.Code § 1109 based on the repetitive and secretive nature, and the difficulties of proof, of domestic violence crimes: "[D]omestic violence is quintessentially a secretive offense, shrouded in private shame, embarrassment and ambivalence on the part of the victim, as well as intimacy with and intimidation by the perpetrator. The special relationship between victim and perpetrator ... easily distinguish[es] these offenses from the broad variety of criminal conduct in general." *People v. Jennings,* 81 Cal.App.4th 1301, 1313, 97 Cal.Rptr.2d 727, 737 (2000), *review denied.* "[E]vidence of other acts is important in domestic violence cases because of the typically repetitive nature of domestic violence crimes, and because of the acute difficulties of proof associated with frequently uncooperative victims and third-party witnesses who are often children or neighbors who may fear retaliation from the abuser and do not wish to become involved." *People v. Brown,* 77 Cal. App.4th 1324, 1333, 92 Cal.Rptr.2d 433, 438–439 (2000)(quoting a California State Assembly committee's bill analysis prepared for the enactment of Cal. Evid.Code

§ 1109), *review denied.* The California State Legislature, in enacting § 1109, had "considered the difficulties of proof unique to the prosecution of these [domestic violence] crimes when compared with other crimes where propensity evidence may be probative but has been historically prohibited." *Brown,* 77 Cal.App.4th at 1333–1334, 92 Cal.Rptr.2d at 439.[8]

Because a rational basis can be stated for the admissibility of prior acts of domestic violence in a domestic violence case, this equal protection claim must fail. Therefore, the state supreme court's rejection of the claim was neither an act contrary to, nor an unreasonable application of, federal law within the meaning of 28 U.S.C. § 2254(d).

### 2. Due Process Claim

■ Petitioner also contends that the trial court violated his state and federal (Fifth and Fourteenth Amendment) constitutional rights to due process by admitting evidence of his prior acts of domestic violence under California Evidence Code § 1109.[9, 10] [Pet. at 6; Ground 2.]

■ "[A] state court's evidentiary ruling, even if erroneous, is grounds for

8. This habeas court must defer to such state court interpretations of state law. *See Murtishaw v. Woodford,* 255 F.3d 926, 956 (9th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1313, 152 L.Ed.2d 222 (2002); *Langford v. Day,* 110 F.3d 1380, 1389 (9th Cir.1996), *cert. denied,* 522 U.S. 881, 118 S.Ct. 208, 139 L.Ed.2d 144 (1997); *Bueno v. Hallahan,* 988 F.2d 86, 88 (9th Cir.1993):

*this issue in its written decision affirming the judgment. [Ret. Ex. G.] Petitioner's petition for rehearing in that court pointed out this omission. [Ret. Ex. I at 191.] The court of appeal then denied that petition without elaboration. [Ret. Ex. J at 197.] The state supreme court denied, without explanation, the petition for review which included this claim. [Ret. Exs. K, L.] In short, the state appellate courts denied this claim sub silentio.*

9. This claim was also denied *sub silentio* by the state appellate courts. Petitioner raised this claim on direct appeal. [Ret. Ex. B at 107–112.] The California Court of Appeal did not address this issue in its written decision affirming the judgment. [Ret. Ex. G.] Petitioner's petition for rehearing in the state court of appeal flagged this omission. [Ret. Ex. I at 191.] The court of appeal then denied that petition without elaboration. [Ret. Ex. J at 197.] The state supreme court denied, without explanation, the petition for review which included this claim. [Ret. Exs. K, L.]

10. Petitioner's due process claim under the California state constitution is not cognizable in this habeas court. *See Estelle v. McGuire,* 502 U.S. at 67–68, 112 S.Ct. at 480; *Engle,* 456 U.S. at 119, 102 S.Ct. at 1567.

federal habeas relief only if it is so fundamentally unfair as to violate due process." *Spivey v. Rocha*, 194 F.3d 971, 977 (9th Cir.1999), *cert. denied*, 531 U.S. 995, 121 S.Ct. 488, 148 L.Ed.2d 461 (2000); *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir.1998); *accord Mancuso v. Olivarez*, 292 F.3d 939, 955–56 (9th Cir.2002); *Dillard v. Roe*, 244 F.3d 758, 766 (9th Cir. 2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 238, 151 L.Ed.2d 172 (2001).

In *Estelle*, the Supreme Court held that the admission of evidence of prior batteries of the victim (the defendant's child) that were of a serious and repetitive nature, in order to establish the non-accidental nature of the victim's death (i.e., battered child syndrome), did not violate the defendant's due process rights, because the evidence of prior injuries was relevant to the issue of whether the victim's death was caused by an intentional act, an essential element of the charge of second-degree murder. *Estelle*, 502 U.S. at 68–70, 112 S.Ct. at 480–481. The Court declined to express an opinion as to "whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." *Estelle*, 502 U.S. at 75 n. 5, 112 S.Ct. at 484 n. 5; *Garceau v. Woodford*, 275 F.3d 769, 774–775 (9th Cir.2001), *reh'g en banc denied*, 281 F.3d 919 (9th Cir.2002), *petition for cert. filed*, ———— (U.S. Jun. 13, 2002)( No. 011862).

After *Estelle*, the Ninth Circuit has considered whether the admission of evidence of other crimes to show propensity is violative of due process:

In *McKinney v. Rees*, 993 F.2d 1378, 1381 (9th Cir.1993), *cert. denied*, 510 U.S. 1020, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993), following the Supreme Court's instructions on remand, the Ninth Circuit addressed the question of "whether the admitted evidence of 'other acts' of the defendant was relevant to a fact of consequence, or was only evidence of character offered to show propensity." The court of appeals subjected the contested evidence to "close scrutiny" in order to "determine whether any inferences relevant to a fact of consequence may be drawn from each piece of the evidence, or whether they lead only to impermissible inferences about the defendant's character." *McKinney*, 993 F.2d at 1381. If the evidence of other acts "tended to make any fact relevant to [the elements of the charged crime of murder] more or less probable, it was relevant and admissible, just as the 'battered child syndrome' evidence in *Estelle* was admissible to prove intent." 993 F.2d at 1382. The court of appeals determined that certain evidence of "other acts" did not give rise to any permissible inference making a fact of consequence more or less probable; that such evidence was not relevant to the questions before the jury; and that such evidence was "emotionally charged," "served only to prey on the emotions of the jury," and "lead them to mistrust" the defendant and believe him capable of killing the victim "without much apparent motive." 993 F.2d at 1382–1385. Under such circumstances, together with the fact that the evidence against the defendant was solely circumstantial, the court of appeals concluded that the erroneous admission of propensity evidence rendered the defendant's trial fundamentally unfair in violation of the Due Process Clause. 993 F.2d at 1385.

In *Garceau*, the Ninth Circuit acknowledged that "the Supreme Court has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes," and that "the Supreme Court

has expressly declined to answer these questions[.]" *Garceau,* 275 F.3d at 775–776. The Ninth Circuit held violative of due process a jury instruction "inviting the jury to draw the propensity inference" from evidence that the defendant had committed a murder, which was "explained in graphic detail and very likely emotionally affect[ing] the jury" and was close in time, and related, to the charged murders. 275 F.3d at 776. The prosecution's case was not a strong one and relied heavily on the propensity inference in closing argument, and there was no physical evidence of the defendant's involvement in the charged murders. 275 F.3d at 775–776. Unlike *McKinney, Garceau* was a case "where there *is* a permissible inference that the jury could draw from the other crimes evidence, but where the jury was expressly invited to draw the *additional* inference of criminal propensity." 275 F.3d at 775 (italics in original).

In *United States v. LeMay,* 260 F.3d 1018, 1027 (9th Cir.2001), *cert. denied,* 534 U.S. 1166, 122 S.Ct. 1181, 152 L.Ed.2d 124 (2002), the Ninth Circuit found Fed. R.Evid. 414 to be constitutional on its face and not violative of due process. That rule authorizes, in criminal cases involving accusations of child molestation, the admissibility of evidence of the defendant's commission of other child molestation offenses and the consideration of such evidence "for its bearing on any matter to which it is relevant." Fed.R.Evid. 414(a); *LeMay,* 260 F.3d at 1024. The operation of Fed. R.Evid. 414 is subject to the requirements of Fed.R.Evid. 403 that relevant evidence be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403; *LeMay,* 260 F.3d at 1026, 1028. The Ninth Circuit reasoned that "there is nothing fundamentally unfair about the allowance of propensity evidence under Rule 414," and that "[a]s long as the protections of Rule 403 remain in place to ensure that potentially devastating evidence of little probative value will not reach the jury, the right to a fair trial remains adequately safeguarded." *LeMay,* 260 F.3d at 1026. The court of appeals made it clear that the admission of such propensity evidence "can amount to a constitutional violation only if its prejudicial effect far outweighs its probative value," and read *McKinney* to hold that "such [propensity] evidence will only *sometimes* violate the constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have." 260 F.3d at 1026–1027.

 Here, the state supreme court's denial of the instant claim cannot be overturned on habeas review "merely because that decision conflicts with Ninth Circuit precedent on a federal Constitutional issue." *Duhaime,* 200 F.3d at 598 (citing *Moore v. Calderon,* 108 F.3d 261, 264 (9th Cir.1997), *cert. denied,* 521 U.S. 1111, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997)). AEDPA requires that the state court decision be either contrary to, or an unreasonable application of, a Supreme Court holding. *Williams,* 529 U.S. at 412, 120 S.Ct. at 1523; *Van Tran,* 212 F.3d at 1154; *Moore,* 108 F.3d at 264 (28 U.S.C. § 2254(d)(1) requires "an authoritative decision of the Supreme Court"). In *Estelle,* the Supreme Court expressly declined to rule upon whether the admission of propensity evidence violates due process. In *McKinney,* the Ninth Circuit acknowledged that it was addressing "the question left unanswered in *Estelle.*" *McKinney,* 993 F.2d at 1384. *Garceau* acknowledged the Supreme Court's continuing silence on the subject and the related one of whether propensity evidence could be admitted for another purpose in the absence of a limiting instruction. *Garceau,* 275 F.3d at 775–776. Since he cannot point to any Supreme Court holding governing this claim, petitioner cannot satisfy AEDPA's requirement that the state supreme court's

denial of this claim be either contrary to, or an unreasonable application of, a Supreme Court holding.

■ Even if arguendo the post-*Estelle* decisions of this circuit were to govern this habeas claim, the claim would still be without merit:

California courts have held that Cal. Evid.Code § 1109 does not offend due process because the trial court's discretion to exclude "propensity evidence" under Cal. Evid.Code § 352, when such evidence's probative value is "substantially outweighed by its prejudicial effect," provides "a realistic safeguard that ensures that the presumption of innocence and other characteristics of due process are not weakened by an unfair use of evidence of past acts." *Brown,* 77 Cal.App.4th at 1334, 92 Cal.Rptr.2d at 439 (following *People v. Falsetta,* 21 Cal.4th 903, 917, 89 Cal. Rptr.2d 847, 986 P.2d 182 (1999)(parallel statutory provision for admissibility of evidence of uncharged sex offense (Cal. Evid. Code § 1108) not violative of due process

because such evidence is subject to exclusion under Cal. Evid.Code § 352.), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 645 (2000)).

This court agrees with *Brown's* due process analysis because it parallels the federal due process analysis of *LeMay.*[11] Fed. R.Evid. 403 and Fed.R.Evid. 414 satisfy due process by excluding propensity evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." *LeMay,* 260 F.3d at 1026, 1028. The operation of Cal. Evid.Code § 1109 in conjunction with Cal. Evid.Code § 352 clearly mirrors that of Fed.R.Evid. 403 and Fed.R.Evid. 414 by requiring the trial court to exclude propensity evidence when its probative value is substantially outweighed by its prejudicial effect. *Brown,* 77 Cal.App.4th at 1334, 92 Cal. Rptr.2d at 439. Accordingly, this court is satisfied that Cal. Evid.Code § 1109 is constitutional on its face.[12]

■ Petitioner also alleges that Cal. Evid.Code § 1109 violates due process by

---

11. This court declines to apply *Garceau,* because petitioner's domestic violence offense is akin to the sex offense in *LeMay* with respect to special proof problems not found in garden-variety crimes of violence (such as the stabbing murders in *Garceau*). *See Falsetta,* 21 Cal.4th at 915, 89 Cal.Rptr.2d at 854, 986 P.2d 182 ("sex crimes are usually committed in seclusion, without third party witnesses or substantial corroborating evidence."); *Jennings,* 81 Cal.App.4th at 1313, 97 Cal.Rptr.2d at 737 ("domestic violence is quintessentially a secretive offense"); *Brown,* 77 Cal.App.4th at 1333, 92 Cal.Rptr.2d at 438–439 ("typically repetitive nature of domestic violence crimes" and "acute problems of proof associated with frequently uncooperative victims and third-party witnesses").

12. Because the Petition generally addresses the effect of Cal. Evid.Code § 1109 on the due process rights of defendants, this court need not address its constitutionality as applied to petitioner. [*See* Pet. at 6; Ret. Ex. K at 214–215.] Nevertheless, it is noteworthy that separate and apart from establishing petitioner's

propensity to commit domestic violence, petitioner's prior acts of domestic violence directed at the victim and others (Snow and Hansen) tended to establish facts of consequence relevant to an element of the charged murder (as distinguished from the lesser included manslaughter offenses)—namely, petitioner's intentional doing of an act with malice aforethought that resulted in the victim's death. Hence, such evidence was admissible without offending due process. *Estelle,* 502 U.S. at 68–70, 112 S.Ct. at 480–481; *McKinney,* 993 F.2d at 1381–1382. The trial court permitted the offering of the contested evidence under both Cal.Evid.Code § 1109 and Cal.Evid.Code § 1101(b), since the evidence was relevant to prove "motive, lack of accident, lack of mistake." [RT 7.] The trial court performed the requisite analysis under Cal. Evid.Code § 352, determining that the probative value of such evidence outweighed its prejudicial effect, and concluding that the prosecution should be permitted to offer the evidence to show malice supporting a murder theory (instead of heat of passion supporting manslaughter). [RT 7–8.]

diluting the prosecution's burden of proving every element of the charged crime beyond a reasonable doubt. [Pet. at 6; Ret. Ex. K at 215.] Cal. Evid.Code § 1109 itself is silent as to the burden of proof for charged crimes involving domestic violence. Petitioner fails to demonstrate his contention, and the record belies it. The jury was charged with CALJIC 2.50.02 (1999 Revision)("Evidence of Other Domestic Violence" ([Cal.] Evid.Code, § 1109)) which stated in pertinent part: "... However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense. The weight and significance, if any, are for you to decide...." [CT 74; RT 357.] This instruction plainly reinforced, not diluted, the prosecution's burden of proof beyond a reasonable doubt as to the elements of the charged crime.

■ Finally, even if arguendo petitioner were to have established a due process error, he would have been unable to establish that such error had a "substantial and injurious effect or influence in determining the jury's verdict" and was therefore not constitutionally harmless. *See Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)( applying the harmless error standard of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) to federal habeas matters); *McKinney,* 993 F.2d at 1385–1386 (*Brecht/Kotteakos* harmless error standard applied to due process claim concerning propensity evidence). Unlike the situations in *McKinney,* 993 F.2d at 1385–1386, and *Garceau,* 275 F.3d at 775, there

was strong, direct evidence, separate and apart from the propensity evidence, that petitioner committed murder. The victim's blood was found on his hand at the crime scene. [Ret. Ex. G at 173.] The cause of Ostrem's death was a stab wound to the chest that entered from the front and exited the back, consistent with the use of an 11-inch knife blade. [RT 217–218.] Petitioner admitted he had retrieved a knife with an 11-inch blade from the kitchen because he wanted to kill her. [Ret. Ex. G at 174; RT 278, 285–286.] He admitted repeatedly stabbing Ostrem with the knife and killing her. [Ret. Ex. G at 173–174; RT 279.] Petitioner also admitted the possibility that he slammed the sliding door, immediately after grabbing the knife and immediately before stabbing Ostrem, so that no one would hear what he was about to do. [Ret. Ex. G at 174; RT 286.] He admitted that as he slammed the sliding door, he said, "you'll pay for that, bitch." [RT 278.] Taken together, petitioner's admissions and the physical evidence sufficed for a reasonable trier of fact to conclude that petitioner killed Ostrem unlawfully (i.e., without justification or excuse) and with malice aforethought.

For all of the foregoing reasons, this due process claim lacks merit. Thus, the California Supreme Court's rejection of the claim was neither contrary to, nor an unreasonable application of, federal law within the meaning of 28 U.S.C. § 2254(d).

**B. Instructional Error**

Petitioner maintains that the trial court violated petitioner's state and federal constitutional rights to a jury trial and due process by instructing the jury on CALJIC 2.50.02 (1999 Revision).[13, 14] [Pet. at 7; Grounds 3, 4.]

---

13. CALJIC 2.50.02 (1999 Revision)("Evidence of Other Domestic Violence ([Cal.]Evid.Code, § 1109)"), as given, states:

Evidence has been introduced for the purpose of showing that the defendant engaged in an offense involving domestic vio-

The mere fact that a jury instruction is allegedly incorrect under state law is not a basis for federal habeas relief.[15] *Estelle*, 502 U.S. at 71–72, 112 S.Ct. at 482. The only question is whether the instruction "by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72, 112 S.Ct. at 482; *Cupp v. Naughten*, 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Karis v. Calderon*, 283 F.3d 1117, 1132 (9th Cir.2002); *Turner v. Calderon*, 281 F.3d 851, 865–866 (9th Cir. 2002); *Garceau*, 275 F.3d at 775. "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72, 112 S.Ct. at 482 (citation omitted); *accord Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995)("We ask whether, under the instructions as a whole and given the evidence in the case, the failure to give the requested

instruction rendered the trial so fundamentally unfair as to violate federal due process."), *cert. denied*, 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996).

Petitioner contends that federal due process is violated because CALJIC 2.50.02 (1999 Revision) permits a jury to rest its verdict solely on a defendant's prior acts of domestic violence without finding the prosecution has proven beyond a reasonable doubt every element of the criminal charge. [Pet. at 7; Ret. Ex. K at 203.] He further contends that in a murder case, the instruction contains an arbitrary and unconstitutional presumption by telling the jury it can infer from a defendant's prior act of domestic violence that the defendant killed with malice in a murder case. [Pet. at 7; Ret. Ex. K at 203.] These contentions are fatally flawed for the following reasons:

First, insofar as petitioner is mounting the same due process attack on CALJIC

lence on one or more occasions other than that charged in the case.

"Domestic violence" means abuse committed against an adult who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the defendant is having or has had a dating or engagement relationship. "Cohabitant" means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship. Factors that may determine whether persons are cohabiting include, but are not limited to, sexual relations between the parties while sharing the same living quarters, sharing of income or expenses, joint use or ownership of property, whether the parties hold themselves out as husband and wife, the continuity of the relationship[,] and the length of the relationship.

"Abuse" means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.

If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that

the defendant had a disposition to commit the same or similar type offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused.

However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense. The weight and significance, if any, are for you to decide.

Unless you are otherwise instructed, you must not consider this evidence for any other purpose.

[CT 73–74; RT 355–357.]

14. The state court of appeal's written decision addressed this due process claim only in terms of California state decisional law. [Ret. Ex. G at 180–183.]

15. For this reason, petitioner's claimed violations of his rights to a jury trial and due process arising under the California state constitution are not cognizable.

2.50.02 (1999 Revision) that he has made as to Cal. Evidence Code § 1109, this claim fails for the reasons discussed in section V.A.2., *supra.*

Furthermore, CALJIC 2.50.02 (1999 Revision) does not address the subject of murder, or any of its elements (e.g., the malice-aforethought element), in the context of prior acts of domestic violence or otherwise. Nor does the instruction require (either by its express wording or its operation) that jurors find, or presume, a defendant's guilt as to the charged crime, or the existence of any essential element of that crime, in the event that they find the defendant to have committed a prior act of domestic violence. Instead, the instruction informs jurors that they "may, but are not required to, infer" from any found prior act of domestic violence that "the defendant had a disposition to commit the same or similar type offenses." [CT 74; RT 356.] If they so infer and find such disposition, the jurors "may, but are not required to, infer" that the defendant "was likely to commit and did commit the crime of which he is accused." [CT 74; RT 356–357.] Therefore, this is unlike the situation where a jury instruction contains a constitutionally infirm mandatory presumption that directs the jury to presume an essential element of the charged offense and thereby "undermine[s] the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt." *Francis v. Franklin,* 471 U.S. 307, 309, 316, 325, 105 S.Ct. 1965, 1968, 1972, 1977, 85 L.Ed.2d 344 (1985); *accord Carella v. Cal-*

*ifornia,* 491 U.S. 263, 264–267, 109 S.Ct. 2419, 2420–2421, 105 L.Ed.2d 218 (1989).

As stated before, CALJIC 2.50.02 (1999 Revision) makes it clear to jurors that their findings and inferences as to prior acts of domestic violence do not relieve the prosecution of its burden of proving beyond a reasonable doubt the charged offense: " . . . However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense. The weight and significance, if any, are for you to decide. . . ." [16] [CT 74; RT 357.]

Finally, even if arguendo petitioner were to have established a due process violation arising out of instructional error, such violation would be subject to harmless error analysis under the *Brecht/Kotteakos* standard. *Garceau,* 275 F.3d at 776; *Murtishaw,* 255 F.3d at 973. As stated more fully in section V.A.2, *supra,* petitioner's trial admissions and the physical evidence presented a strong, direct case of murder independent of the evidence of prior acts of domestic violence. Hence, any such due process error had no "substantial and injurious effect or influence in determining jury's verdict" and was therefore constitutionally harmless.

Because this due process claim is devoid of merit, the California Supreme Court's denial of the claim was neither contrary to, nor an unreasonable application of, federal law within the meaning of 28 U.S.C. § 2254(d).

---

**16.** The jury also heard other standard instructions as to the prosecution's burden of proof beyond a reasonable doubt as to the charged offense and each of its elements, including CALJIC 2.90 ("Presumption of Innocence–Reasonable Doubt–Burden of Proof") and CALJIC 8.50 ("Murder and Manslaughter Distinguished"). [CT 82, 95; RT 359–360, 367.]

It is presumed that the jury heeded all of the instructions in its deliberations. *See Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 1706–1707, 95 L.Ed.2d 176 (1987); *Wade v. Calderon,* 29 F.3d 1312, 1321 (9th Cir.1994), *cert. denied,* 513 U.S. 1120, 115 S.Ct. 923, 130 L.Ed.2d 802 (1995).

## VI. Conclusion

For the reasons discussed above, the Magistrate Judge recommends that the Court issue an Order: (1) approving and adopting this Final Report and Recommendation; and (2) denying the Petition and dismissing this action with prejudice.

Dated Nov. 12, 2002.